Mary COLEMAN, Plaintiff,

v.

**DANEK MEDICAL, INC.,
et al., Defendants.**

**Melvin Burks, Plaintiff,**

v.

**Danek Medical, Inc., et al., Defendants.**

**Civ. A. Nos. 3:96CV776LN,
3:96CV777LN.**

United States District Court,
S.D. Mississippi,
Jackson Division.

Feb. 26, 1999.

Order Entering Judgment,
March 16, 1999.

---

John Arthur Eaves, Jackson, MS, Donna S. Cummings, Frank C. Dudenhefer, Jr., Cummings, Cummings, Dudenhefer & Martin, New Orleans, LA, for Plaintiffs.

Neville H. Boschert, John Chase Bryan, Watkins, Ludlam, Winter & Stennis, Jackson, MS, for Defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

Plaintiffs Mary Coleman and Melvin Burks filed separate actions against Danek Medical, Inc., Sofamor Danek Group, Inc. and Warsaw Orthopedic, Inc. (collectively, Danek), and others, each claiming that he/she suffered injuries when a defective orthopedic bone screw device designed, manufactured and sold by Danek was attached to his/her spine during spinal fusion surgery performed by Dr. Bruce Senter.[1] Both cases were referred to the District Court for the Eastern District of Pennsylvania for purposes of multi-district pretrial litigation, MDL Docket No. 1014, and were returned to this court after completion of discovery and resolution of non-case specific legal issues. The cases have since been consolidated.

Danek has now moved in both cases for summary judgment, and has separately moved to strike the expert reports and testimony of the plaintiffs' putative expert, Dr. Antonio Aldreti. Danek has also filed in the Burks case a motion to dismiss for fraud on the court, asserting that Burks has provided false responses to questionnaires/interrogatories, failed to produce documents requested by defendants in discovery and ordered to be produced by the MDL court, and has given false deposition testimony. Coleman has responded in opposition to Danek's motion to strike and for summary judgment. Burks responded to the motion to strike and for fraud on the court; he did not file a response to Danek's summary judgment motion and the time for doing so has now long passed. Having considered the parties' submissions on these various motions, including their memoranda and exhibits, the court concludes that Danek's motions for summary judgment and to strike plaintiffs' expert reports and testimony should be granted. Regarding Danek's motion to dismiss Burks' complaint for fraud on the court, because the court is not persuaded that Burks has given false deposition testimony, and is not convinced that Burks' false responses to discovery requests and/or his failure to produce required documents to defendants was an intentional effort to deceive Danek or the court, the court will deny the motion to dismiss, though it is of the opinion that sanctions are in order.

*Coleman:*

In July 1992, immediately following a slip and fall at work, Coleman began experiencing pain in her back and a burning sensation going down her right leg and thigh, which led her to consult Dr. John McFadden. Over the next year, Dr. McFadden treated her pain through non-surgical methods, without any significant relief of her pain. Dr. McFadden thus referred plaintiff to Dr. Bruce Senter, an orthopedic surgeon specializing in spinal fusion surgery.

When Dr. Senter first examined plaintiff in August of 1993, she complained of pain in her lower back, and her right thigh and leg. Dr. Senter examined the plaintiff and found nothing on that visit to indicate a need for surgery. So, plaintiff returned to Dr. McFadden for continued conservative

---

1. Plaintiffs originally sued a number of defendants in addition to Danek, including medical associations and physicians which they alleged had conspired with Danek to unlawfully promote Danek's products. Neither sued Dr. Senter.

The court has granted summary judgment for the medical associations by memorandum opinion and order dated April 30, 1998, and since then, the remaining defendants, other than the Danek defendants, have been dismissed by agreement of the parties.

treatment of her pain. A year later, however, her pain still not having been relieved, Coleman returned to Dr. Senter. At that time, given that plaintiff had been experiencing what she described as consistent and fairly severe pain for more than two years, and that a lumbar discogram in January 1995 resulted in positive responses by Coleman at the L–4 and L–5 levels, Dr. Senter offered Coleman the option of spinal fusion surgery.[2] As will be discussed more fully *infra*, prior to the surgery, Dr. Senter explained the nature of the proposed procedure, and informed plaintiff that while the procedure might alleviate or at least relieve some of her pain, there were no guarantees that her condition would improve. He also informed her that the use of screws in the vertebral body pedicles, which he proposed to do, had not been approved by the FDA. Following discussions with Dr. Senter regarding the proposed surgery, and review of materials provided by Dr. Senter which

explained the risks attending the procedure, Coleman consented to the surgery. Thus, on February 6, 1996, Dr. Senter performed both anterior and posterior fusions from L4 to L5 to the sacrum using the Dyna–Lok System marketed by the Danek defendants.

While Coleman's lower back pain improved "just a little" for a brief period following the surgery, her hip and leg pain remained constant. Though it appeared on X-rays that the fusion, in Dr. Senter's words, "looked good," that the screws were in good position, i.e., that there was nothing to indicate any movement or breakage of the metal, and that there was good fusion, because plaintiff reported that she was not any better than she was before the surgery,[3] he recommended that she have a second surgery to remove the instrumentation and to make sure that the fusion was successful.

Accordingly, in August 1996, this surgery was performed. Dr. Senter's records

---

**2.** The court in *Smith v. Sofamor, S.N.C.,* 21 F.Supp.2d 918 (W.D.Wis.1998), explained as follows:

> Spinal fusion surgery is a method of placing bone graft material between two mobile segments of the spine to knit them together as one bony unit and eliminate motion between the segments. Fusion surgery can be performed with or without the use of spinal instrumentation for internal fixation. With or without the aid of internal fixation instruments, there is a risk that the fusion will not occur.
>
> Internal fixation instruments are used to provide stability to decrease motion between segments of the spine to allow the bone fusion to knit together. They act as an internal splint. If a solid fusion is obtained, the device is no longer providing structural support and can be removed. If a solid fusion is not obtained at some point in time the internal fixation device will fail. Internal fixation devices may be attached with hooks, wires or bone screws. When bone screws are employed they are screwed into the pedicles of a vertebra and connected to rods or plates to stabilize movement between the vertebrae to which they are connected.

At 919.

**3.** Coleman has taken contradictory positions in this case concerning the extent of her pain following the implant surgery. In her deposi-

tion in this case, she testified clearly and unequivocally that she had the "same pain" before the surgery as after, and that while she was no better following the surgery, neither was she any worse. She reported in a questionnaire that she completed and filed in MDL 1014 (which was used in lieu of interrogatories) that her back, hip and leg pain were worse after the implant surgery than before. And in her response to Danek's summary judgment motion, she recites that her back pain remained the same after the surgery as before but that her leg pain increased following the surgery.

Dr. Senter's contemporaneous office notes reflect that plaintiff initially reported that she was doing "very well" after the implant surgery, and thought her pain was "significantly better." Several months later, she reported she was doing "fairly well." A couple of months after that, she complained that she was having persistent back pain. And when she again saw him six months later, she reported that her back pain "had returned."

Plaintiff has offered no explanation for the inconsistencies in the positions she has taken on this subject, and none is readily apparent. Nevertheless, for purposes of this motion, the court will accept Coleman's worst-case version of her post-implant pain.

reflect that he found a solid fusion, and removed the hardware. Afterwards, plaintiff had some slight decrease in her pain, and particularly her leg pain, but ultimately, she still had the same pain that she had before the surgery. There was no improvement in her condition.

*Melvin Burks:*

In 1990, Burks injured his back when lifting a box at work. He was initially treated for a muscle pull at the emergency room of the local hospital, but when his back and left leg pain persisted, he sought treatment from his family physician. Because X-rays revealed a problem with a disc, that physician referred Burks to a neurosurgeon, James T. Robertson. Upon examination, Dr. Robertson determined that Burks had a ruptured disc, so in September 1991, Dr. Robertson performed a discectomy at the L4–L5 level.

After that surgery, Burks continued to have low back pain and, whereas he had previously had pain in his left leg, he developed pain and numbness in his right leg and toes. Burks was seen and treated beginning in November 1991 and over the next several months by Dr. John McFadden for his intractable pain. A lumbar myelogram in May 1992 revealed a foreign object at the L–1 level. Dr. Robertson immediately operated to remove the object (which was found to be a surgical sponge that had been left in the surgical site at the time of the earlier discectomy).

Burks still had severe low back pain following this surgery, as well as numbness in his right leg which caused his leg to "go out" on him. So, in February 1993, Dr. McFadden referred him to Bruce Senter. Following the initial visit and examination by Dr. Senter, Burks was referred to a Dr. Robinson, a neurosurgeon, for lumbar discography. This was done in March 1993, with a positive result at the L4–L5 disc. At that time, Dr. Senter discussed with Burks the possibility of his having fusion surgery, but at that time,

Burks apparently did not pursue that option and in fact, he did not return to see Dr. Senter until late January, 1994. Again, Dr. Senter discussed the option of surgery with Burks, who decided to have the operation. Following a February 21, 1994 "surgical conference" during which Dr. Senter explained to Burks the potential benefits and risks of the surgery, Dr. Senter performed the surgery on February 22, 1994, in which he implanted a Danek Dyna–Lok System. Though Burks' condition was initially better for the first six months or so after the surgery, his pain eventually returned and became worse, which led Dr. Senter to recommend that the fusion mass be explored and the hardware removed. This was done in November 1994, approximately nine months after the implant surgery. Following this surgery, Burks experienced some relief of his pain, but still continued to have pain and numbness in his right leg and foot.

*The Motion to Dismiss Burks' Complaint for Fraud on the Court:*

Claiming that Burks has engaged in a course of conduct designed to deceive Danek and the court, Danek urges the court to impose against him the ultimate sanction of dismissal, in accordance with the court's authority under Rule 37 and its inherent authority to protect the integrity of judicial proceedings before it. In support of this motion, Danek asserts that Burks has made misrepresentations—of omission and commission—in discovery responses, and has given false deposition testimony as to the plainly material issue of his condition following the implant surgery by Dr. Senter, all of which warrants dismissal of Burks' complaint in its entirety.

Danek points out that in MDL No. 1014, a questionnaire was sent to Burks in 1995, and a revised questionnaire sent to him in 1996,[4] both of which asked whether he had "ever filed a personal injury lawsuit or claim before." Both times, Burks re-

---

**4.** The questionnaires were used in lieu of interrogatories.

sponded "No" to this question, even though he had previously filed two medical malpractice lawsuits against Dr. Robertson relating to the discectomy procedure in which the surgical sponge was left in his back.[5] Further, while Burks had been deposed in the Robertson malpractice litigation and had testified specifically on the subject of the implant surgery performed by Dr. Senter and his medical condition following that surgery, Burks did not produce a copy of that deposition transcript in response to an MDL order which directed production of "transcripts [he] presently ha[s], including transcripts in the possession of any attorney representing plaintiff in present or prior proceedings, or all prior testimony given by any plaintiff in actions (including litigation, worker's compensation proceedings, disability hearings, and the like) relating to the plaintiff's physical condition which is at issue in this litigation."

In response to Danek's motion, Burks asserts that while his responses to the original and revised questionnaires on the subject of prior lawsuits were incorrect, they were not intentionally false. He states by way of explanation, and has submitted an affidavit to this effect, that when he received the questionnaires, he took them to the office of his local attorney, Jimmy Shelton, where they were read to him by one of Shelton's employees since he, Burks, could not read sufficiently well to read the questionnaire himself. He says that he did not understand that the question about prior "personal injury lawsuits or claims" was intended to elicit information about whether he had ever hired a lawyer and sued someone, for had he understood that to be the inquiry, he would have responded affirmatively to the questions. Also accompanying Burks' response to the motion to dismiss is an affidavit of attorney Jimmy Shelton, his local attorney, who explains that he did not personally participate in the process of preparing Burks' response to the questionnaires, and states that the individuals in his office who assisted Burks could not have known of Burks' malpractice suits.

Burks takes the further position that his failure to produce a transcript of his earlier deposition testimony was similarly unintentional, and was merely the product of miscommunication and/or misunderstanding and a failure on his part to comprehend what was required of him. He maintains that he understood that he was only to produce any transcripts "in his possession," and since he had no transcript "in his possession," there was nothing for him to produce. He explains that he was made aware of the document production request by a letter which was sent directly to him, and not to his local attorney, by one of the lead attorneys in the MDL case, John Cummings III, so Shelton was not aware of the request and Cummings, having no knowledge of the malpractice case because of the "No" responses on Burks' questionnaires, did not know that a transcript existed.

The court considers that it has ample cause for skepticism of Burks' explanations regarding these matters. The court has no difficulty understanding that a person such as Burks, who has a limited education and, in his own words, "ain't no good reader," might have difficulty comprehending "certain words and certain questions." Nevertheless, the court cannot fathom what Burks thought was meant by the question, "Have you ever filed a personal injury lawsuit or claim before?" Given that he was able to answer "No" both times he confronted this question, he evidently had some comprehension of what was meant. But he has not explained for the court what he thought it meant. Moreover, while Burks (or his counsel) points to his deposition testimony as evidence of his inability to understand "cer-

---

**5.** One suit was filed in federal court in Tennessee, and the other was filed in state court . in Mississippi.

tain words and certain questions," the fact is that during his deposition, whenever counsel asked a question that Burks did not understand, *Burks asked for clarification before answering the question.* Furthermore, the court's own perusal of Burks' deposition testimony discloses rather apparently that Burks has a substantially higher "level of understanding" than Burks or his counsel would have the court believe. Finally, as regards the document production request, the court would observe that the letter and document request summary forwarded to Burks by the Cummings firm did not ask only for transcripts in Burks' personal possession; and Burks, for his part, represented not only that he had no documents responsive to the request but also that he did not know of anyone who had documents responsive to the request.

■ While Burks' false responses on the questionnaires and his failure to produce a transcript of his deposition testimony in the Robertson malpractice case should not be without consequence, the court, because it is unable to say with assurance that Burks' conduct was intentional and calculated to mislead, is not convinced that the sanction of dismissal is warranted on these grounds.

With reference to Burks' deposition testimony, Danek argues that Burks has provided inconsistent—and false—testimony regarding his condition following the fusion surgery by Dr. Senter and for that reason should have his claims dismissed. It notes, specifically, that when deposed in the Robertson malpractice litigation on August 30, 1994, *which was at a time when the defendant's product was still implanted in his back,* Burks testified that his pain was "better" after the surgery than before, that he "[didn't] hurt as bad as [he] hurt in [his] back before [he] had this surgery," and that the fusion surgery by Dr. Senter had helped him "a lot—a whole lot." In contrast, when deposed in this case in June 1997, he testified that "after they put those bolts and screws and

stuff in there, I started hurting—I hurt badder than if I hadn't had surgery." While Burks' testimony in the two cases appears facially inconsistent and irreconcilable, it is not necessarily so when considered together with Dr. Senter's testimony that in fact, for about the first six months following the fusion surgery, including up through early August 1994, Burks did report improvement in his pain. On an August 22 office visit, he did complain that he was having pain, and when he returned two months later, in late October, he had a cane and reported that he was in significant pain. Dr. Senter testified that because of recurrence of Burks' pain, he recommended that the instrumentation be explanted.

Considered in light of Dr. Senter's testimony, the court is unable to conclude that Burks' testimony of August 30, 1994 was false, for around that same time, he was reporting to Dr. Senter that his condition was improved. By the same token, the court cannot conclude that his June 1997 testimony that his condition worsened following the surgery was false, since apparently, sometime between August 22 and late October 1994, his condition did worsen sufficiently to prompt Dr. Senter to recommend a second surgery to remove the spinal fixation device. Inasmuch as the court cannot conclude that Burks has provided false testimony, it will deny Danek's motion to dismiss on this ground.

■ While both local and lead counsel for Burks have acknowledged that Burks' questionnaire responses were false (or "incorrect," in their words), and have conceded that the deposition transcript should have been produced but was not, they nevertheless maintain that no fault for these misstatements and omissions may be attributed to any of them. Burks, they say, lacked the wherewithal to deceive, and none of the attorneys was responsible for the responses or lack thereof since none was sufficiently involved in and/or aware of the specifics of the discovery requests and response process to have known what was

transpiring. In the court's opinion, however, since Burks, as his counsel knew or should have known, was himself incapable of assuring the correctness of his responses, then his attorneys had a greater responsibility as officers of the court to themselves assure that counsel opposite and the court would not be misled. Having failed in this responsibility, the court considers that a monetary sanction of $500 is properly assessed against plaintiffs' counsel.

*The Motions for Summary Judgment:*

*The Conspiracy Theory:* Both Coleman and Burks have asserted claims that Danek engaged in an unlawful conspiracy with various medical associations and physicians (formerly defendants in this case) to market its products. Basically, they charge that Danek recruited physicians, through the use of improper financial incentives and arrangements, to promote its products at workshops and symposia, despite the fact that its products had not received FDA approval for the use recommended, i.e., use in the pedicles, and with knowledge that the safety and efficacy of the devices for such a use had not been clinically proven. While the bulk of Danek's memoranda on its motions for summary judgment is primarily directed to the plaintiffs' product liability claims, it has moved for summary judgment on all of plaintiffs' putative causes of action, including their conspiracy claim. Danek submits that it is entitled to summary judgment on these claims for the same reasons this court previously granted summary judgment in favor of the medical associations on the conspiracy claims. The court agrees.

In an opinion entered in the Coleman case in April 1998, the court concluded that even could Coleman prove her allegations of an unlawful conspiracy between Danek and the medical associations, she could not prevail on that claim given the absence of proof of reliance and causation. Simply put, the evidence was uncontroverted that Dr. Senter's "decision to recommend use of the device in [Coleman's] case was" his own decision based on his own independent medical judgment and was not based on anything he had heard (or not heard) at any seminar; that he was "aware of the risks and complications [of pedicle screw fixation] based on his own experience and exposure to information on the devices from a variety of sources;" that he was aware of the lack of FDA approval of the devices for this use; and that while he was not specifically aware of any financial arrangements between the medical associations and the device manufacturers, there was no proof that such knowledge would have affected his treatment decision.[6]

In response to Danek's motion, Coleman[7] persists in her effort to establish that an unlawful conspiracy existed between Danek and the medical associations, making no effort in the process to address the issues which the court has previously found to be dispositive of the conspiracy claim, i.e., the lack of proof of reliance or causation.[8] For that same lack of proof which led to the dismissal of Coleman's

---

6. Following entry of the opinion granting summary judgment to the medical associations in Coleman's case, Judge William H. Barbour granted summary judgment for the medical associations on the same basis in Burks' case. Thereafter, the two cases were consolidated.

7. It will be recalled that Burks has not responded to the summary judgment motion.

8. The argument in Coleman's brief that there is "reason to believe" that there was certain information of which Dr. Senter was "never made aware" is an argument which was made in response to the medical associations' summary judgment motions and rejected as a basis for denying summary judgment. Her further argument that the Dyna–Lok device was available for implantation into plaintiff only because Danek was successful in creating a "standard of care" and a "black market" for its devices was also rejected by the court in its earlier opinion.

conspiracy claim against the medical associations, the court now concludes that summary judgment should be entered for Danek on the plaintiffs' conspiracy claims.

*The Product Liability Claims*

Danek submits that it is entitled to summary judgment on plaintiffs' product liability claims because plaintiffs cannot prove that Danek's product was defective or that any alleged defect in its product caused any injury to the plaintiffs.[9] Under Mississippi law, in order to prevail on their product liability claims against Danek, plaintiffs must prove that the Dyna–Lok System manufactured and marketed by Danek was defective, either

> because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or ... because it failed to contain adequate warnings or instructions, or ... [that it] was designed in a defective manner, or that it breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product.

Miss.Code Ann. § 11–1–63(a)(i)(1–4). Having thoroughly reviewed the record evidence in this case, and having considered the parties' arguments, the court concludes that plaintiffs have not adduced sufficient evidence of product defect to withstand Danek's summary judgment motions. In fact, they have adduced *no evidence* of a product defect.

██ The plaintiffs have not alleged or undertaken to prove the existence of a manufacturing defect;[10] rather, they appear to assert design defect and failure to warn (or failure to *adequately* warn) as the bases of their claims. In order to prevail on a claim of design defect, plaintiffs must prove that

> (i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and
>
> (ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

Miss.Code Ann. § 11–1–63(f). In her response to Danek's motion, Coleman declares that Danek's product was "defectively designed," yet nowhere in her response does she identify even generally the nature of any alleged design defect.[11] She does state in a footnote that she has "amassed substantial evidence that pedicle screw fixation devices, such as the Dyna–Lok device at issue, were defectively designed, inadequately tested, and incapable of improving clinical results in spine fusion operations." However, the exhibits to which she refers the court in connection with this assertion do not address or purport to identify any design defect in such devices, but rather are devoted principally to the

---

**9.** Danek points out in its motion that Sofamor Danek Group, Inc., Sofamor, Inc., and Sofamor, S.N.C. are not manufacturers or sellers of the Dyna Lok System or its component parts and that those defendants are entitled to summary judgment on plaintiffs' product liability claim for that reason. Plaintiffs do not dispute this.

**10.** There is no evidence that the instrumentation used in their surgeries broke, bent or otherwise malfunctioned in any way.

**11.** She states, without elaboration, "[P]laintiff has proffered expert testimony to support her claim that she has been injured, in that a defectively designed and inadequately tested medical device was implanted into her back and that she had to undergo additional surgery to remove it."

question of whether the use of internal fixation devices in spinal fusion surgery provides any tangible benefit over surgery without the use of such devices.[12] And even on that subject, the exhibits reveal only that there are differences of opinion as to whether there is any improvement in the clinical outcomes depending on whether or not instrumentation is used.

As the court observed in *Cather v. Catheter Technology Corp.*, 753 F.Supp. 634 (S.D.Miss.1991), while under Mississippi law, "it is unnecessary to prove a specific, identifiable defect in a cause of action based on strict products liability," the plaintiffs "must at least produce that minimal amount of circumstantial evidence that would allow a jury to infer a defective quality in the product. ... Mere proof of damage following the use of a product is not sufficient to establish liability." *Id.* at 638–39. *At best*, the plaintiffs in these cases have established proof of damage following the implantation of Danek's product. And that is not sufficient to establish the existence of a product defect.

■ As an additional, and alternative, basis for claiming that Danek's product was defective, Coleman argues that the Dyna–Lok System was defective based on Danek's failure to warn of the dangers of its use. This failure to warn claim, she argues, is viable even in the absence of identification of a specific design defect.[13]

■ Danek contends that inasmuch as the evidence clearly establishes that Danek warned physicians, including Dr. Senter, of all known or knowable risks attending the use of its Dyna–Lok System, a medical device, then plaintiffs' claims are precluded by the learned intermediary doctrine. Under that doctrine,

> [a] manufacturer has a duty to adequately warn the prescribing physician of any known adverse effects which might result from use of its product. ... A warning may be held adequate as a matter of law where the adverse effect that was ultimately visited upon the patient was one that the manufacturer specifically warned against.

*Cather*, 753 F.Supp. at 640. *See also* Miss. Code. Ann. § 11–1–63(c)(ii).[14]

The "adverse effects" which Coleman claims she suffered as a consequence of the implantation of Danek's product are increased pain, which caused her to have to undergo a second painful operation to remove the hardware, and a failure of the instrumentation to achieve a solid fusion. In its motion, Danek points out that the risk of each of these eventualities was included among the "possible adverse effects" listed in the package insert which accompanied its product, as follows:

> [a]n adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product; or in the case of a prescription drug, medical device or other product that is intended to be used only under the supervision of a physician or other licensed professional person, taking into account the characteristics of, and the ordinary knowledge common to, a physician or other licensed professional who prescribes the drug, device or other product.

12. One of the referenced exhibits, the generic expert report of Norman Welford, M.D., C.C.E., addresses the manner of manufacturers' marketing of these devices and obviously has nothing to do with any product defect. In another of the cited exhibits, Dr. Harold Alexander, Ph.D., opines that the complication rates in cases of fusion procedures involving instrumentation is "significantly higher" than that in cases where no instrumentation is used. Coleman has cited this report despite Judge Bechtle's having ruled in MDL No. 1014 that Dr. Alexander is not qualified to render opinions on the issue of clinical complications of pedicle fixation.

13. Presumably Burks would take the same position.

14. That statute states:

POSSIBLE ADVERSE EFFECTS:

. . .

8. Non-union (or pseudoarthrosis). . . .

9. Loss of neurological function, appearance of radiculopathy, dysesthesia, and/or the development of pain. . . . .

NOTE: Additional surgery may be necessary to correct some of these anticipated adverse reactions.

It notes that its insert further states that [a] successful result is not always achieved in every surgical case. This fact is especially true in spinal surgery where many extenuating circumstances and other medical conditions may compromise the results.

Danek contends that inasmuch as its knowledge of these specific risks was imparted to Dr. Senter, then it cannot be liable to Coleman on a failure to warn theory. Coleman, however, argues that Danek cannot rely on the warnings given in its package insert as a basis for avoiding liability for failure to warn, since the package insert gave no warnings about the risks associated with using the Dyna–Lok System *for pedicle screw fixation,* an "off label" use of the product, and since Danek, by actively promoting its product as safe and effective for such "off-label" use, fatally undermined the "boilerplate, cautionary statements" in the package insert. She further argues that "because Danek did not fully and fairly disclose to [plaintiff's treating physician] the dangers of using the Dyna–Lok device for pedicle fixation," then the learned intermediary doctrine does not insulate it from liability.

■ The court rejects Coleman's contention, for there is no evidence that Dr. Senter was not fully aware of the various risks associated with the use of the Dyna–Lok System for pedicle screw fixation, and in fact, the uncontroverted evidence is to the contrary.[15] Indeed, the proof establishes without dispute that he was specifically aware of the risks of the adverse effects claimed by Coleman to have been visited upon her, and that he disclosed these very risks to Coleman.[16] For these

---

**15.** *See supra* pp. 643–44.

**16.** Coleman signed a consent form prior to the surgery, which provided as follows:

I am fully aware of the condition of my spine for which I am presently being treated. This informed consent hereby authorizes Dr. Senter and/or such assistants as may be selected and supervised by him to perform a *decompression and fusion* procedure on my back. This procedure involves removing tissue which may include bone, disc, and/or ligaments to relieve pressure from the nerves. This is the part of the procedure called the decompression. Fusion may be required as well, which involves linking or fusing several vertebrae together by means of a bony bridge. In order to obtain this bony bridge, bone is either taken from my pelvis or from a bone bank. The fusion may also involve utilizing an internal fixation device. This device may consist of screws, plates, and/or rods which will provide stability and aid in obtaining the fusion. The screws that may be utilized will be placed into the vertebral body. The placement of these screws has been performed extensively since the mid–1980's, however, at this point the placement of these screws in the vertebral body

pedicles has still not been approved by the Food and Drug Administration. The Food and Drug Administration considers pedicle screw fixation experimental. Most spine surgeons consider pedicle screw fixation to be the standard of care. I also consent to guests and to the making of a pictorial record of the surgical procedure for use in scientific studies, medical publication, or other similar purposes.

Dr. Senter has discussed with me at length risks and complications which include, but are not limited to the following:

. . .

* non-union or non-healing of the fusion mass

. . .

* pain may not be relieved even with successful decompression and fusion

There is also a possibility of needing to remove the internal fixation and explore the fusion sometime in the future. If this does need to be done the subsequent surgery would certainly carry with it the expected risks as well.

. . .

I am also aware that in addition to the risks described above there are risks that attend the performance of any surgical procedure. I am also aware that the

reasons, the court concludes that Coleman cannot prevail on her failure to warn claim against Danek. *See Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 814 (5th Cir. 1992) (to establish inadequacy of warning, plaintiff must prove, *inter alia,* that different warning would have prevented treating physician from administering the drug).[17]

For these same reasons, Burks' failure to warn claim is likewise unsupportable. Burks maintains that as a result of the implantation of Danek's product, he suffered increased pain and nerve damage. However, these are risks of which Dr. Senter was aware, and which were made known to Burks.[18]

The absence of proof of any product defect is alone a sufficient basis for entry of summary judgment. But even had plaintiffs provided adequate evidence on the defect prong of their claim, the fact that they have adduced no competent proof that the Danek product, or a defective condition of the product, proximately caused them injury is another, alternative ground upon which summary judgment is warranted on this claim.

■ The only "evidence" provided by Coleman or Burks in support of their respective claims in these cases is the reports and testimony of their expert, Dr. Antonio Aldreti, M.D. Danek has moved to strike Dr. Aldreti's testimony on the bases that he is not qualified to render an opinion in these cases on the subject of causation, and that even if qualified, his putative opinions do not satisfy the standards for admissibility set by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In Coleman's case, Dr. Aldreti opined as follows in his original expert report:

> It is obvious that this patient['s] condition was worsen[ed] by the implantation of metal hardware and even when the bone fusion was "absolutely beautiful from L4 to the sacrum," she continued to have severe low back pain with the metal screws and plates in place. Their removal did not significantly improve the pain nor her disability. Essentially this hard working woman was made disable[d] by the implantation of the instrumentation for the purpose of obtaining a spine fusion. Indeed a tragic result for this patient.

At a deposition taken in February 1998, Dr. Aldreti acknowledged that the mere fact that a patient might get worse or report postoperative pain after an instrumented fusion surgery does not mean that the surgeon's technique was improper, that the patient failed to follow the doctor's postoperative instructions, or that the hardware used in the surgery is necessarily to blame. He also agreed in that deposition that in the majority of cases, one would need some radiological evidence in

practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me concerning the results of the proposed procedure.

Further, in keeping with his usual practice, Dr. Senter made a videotape of a verbal consent by Coleman, in which she acknowledged that Dr. Senter had discussed the risks and potential complications. She agreed that she understood "that the plates and screws that [were to be] used [were] not specifically approved to be put into the spine in the fashion that [Dr. Senter] was going to use them," and that she understood that Dr. Senter could not guarantee her a successful outcome.

**17.** The statement by Coleman's expert, Antonio Aldreti, M.D., contained in his supplemen-

tal expert report, that Dr. Senter lied to Coleman in order to obtain her consent to surgery is beyond the scope of any arguable expertise which Dr. Aldreti may have and his statement on this point may be disregarded for that reason. In any event, however, Danek could not be held liable for any misrepresentations by Dr. Senter, so long as Dr. Senter was himself adequately apprised of all relevant information regarding Danek's product.

**18.** Burks signed a consent form identical to that signed by Coleman, and was likewise recorded on videotape acknowledging his understanding of the lack of approval of the use of the device proposed by Dr. Senter and his understanding that there was no guarantee of a successful outcome. *See supra* n. 16.

order to arrive at a conclusion that the hardware used in connection with the fusion surgery was causing a patient's postoperative pain.[19] When later questioned in an April 1998 deposition as to the basis for the opinion he had rendered in Coleman's case, Dr. Aldreti testified:

I think the patient has continued to have problems, and there's evidence to th[e] effect that the fusion was not satisfactorily functioning because the pain continued. The patient didn't go to see Dr. Senter to have the spondylolisthesis corrected. She went to see him because she had pain. The pain persisted after the first operation. The pain was worsened after the second operation, she stated, to her legs, and he decided to give her a 15 percent impairment rating. I think that's strong evidence that whatever was done did not do what it was supposed to have done or accomplished.

In May 1998, after reviewing additional medical records, Coleman's deposition and other exhibits, Dr. Aldreti provided a supplemental expert report, in which he concluded:

I am of the opinion, with a reasonable degree of medical certainty, that there was, and there is, significant doubt that a solid fusion was achieved in its entirety. First, because the patient's symptoms have reappeared and continued to worsen, second because Dr. McFadden repeatedly indicated it to be so. A myelogram, followed by a CAT scan, should be sufficient to define what really is going on. Even when a solid fusion was achieved, which is questionable, the basic fact is that the patient agreed to have the operation so as to have her low back pain relieved; the fusion with instrumentation failed to accomplish that primordial objective. Additionally, it rendered her permanently disabled in that she has not worked since 2 Jan 95—the day of the operation. Three years later, even after removal of the hardware, she is having low back pain with signs and symptoms of radiculopathy.

Reduced to its essentials, Dr. Aldreti's opinion is simply that Coleman's fusion surgery was not successful because it did not relieve her pain and in fact resulted in an increase in her pain,[20] rendering her permanently disabled,[21] and because a sol-

---

**19.** He testified that in some cases, such as "when the patient says I feel something moving or you touch it and it's moving or the screw is protruding, you would have the diagnosis" that the hardware was causing the pain, but according to Dr. Aldreti, "even then you would want to confirm it to radiology."

**20.** Whether or not that is the case is debatable, but the court assumed that she was in worse pain after the surgery. *See supra* n. 3.

**21.** Dr. Aldreti's conclusion that Coleman was rendered disabled is based on his understanding that she was able to work and was in fact actively working up to the date of the surgery but has not been able to work since the surgery, and in fact, has been assigned a fifteen percent impairment rating by Dr. Senter, who had said she had a zero percent impairment rating before the surgery. According to the plaintiff's own testimony, however, even prior to the implant surgery in February 1995, she was in such extreme pain that she could not walk very well, could not do housework, and could not work anymore and that she had in fact had quit work.

Q. Were you able—and I'm talking just right there before the surgery, you couldn't walk very well. What about work? Were you able to work at all?
A. Before the surgery?
Q. Yes, ma'am.
A. No.

She testified that Dr. Senter advised her before the surgery that she would "never be able to work again," with *or without* the surgery, and that the purpose for the surgery was not to enable her to return to the work force, but solely as an effort to achieve some relief for the pain she was experiencing. Given Coleman's testimony that her pre-implant pain precluded her from working, the fact that she could not work post-implant—a fact for which Dr. Aldreti did not account in rendering his opinion—is plainly not a sufficient factual basis for concluding that the surgery rendered her disabled. In any event, even if she had become unable to work as a result of the surgery, there is nothing, aside from Dr. Aldreti's speculation, to show that this could reasonably be attributed to the Danek product, or some unidentified defect in the product, rather than to some other cause.

id fusion may not have been obtained.[22] Yet, while he has provided two expert reports on this subject and been twice deposed, other than by unexplained, conclusory assertions, Dr. Aldreti has never identified any causal nexus between Danek's product (or a defect in the product) and any harm suffered by Coleman. Particularly when considered in light of the fact that he has acknowledged that patients can have a poor outcome from fusion surgery, including failures to achieve solid fusion and increased pain and nerve damage, even when the fusion surgery involves the use of no instrumentation or the use of alternative types of hardware such as hooks and wires, Dr. Aldreti's opinion avails this plaintiff nothing.[23]

Neither has Dr. Aldreti offered any competent proof of causation in Burks' case. In his expert report of September 20, 1997, Dr. Aldreti expressed the opinion that Burks "sustained permanent nerve injury from the implantation of metal plates and screws into his lumbar spine." It is manifest, however, that in Burks' case, just as in Coleman's, Dr. Aldreti has identified no basis for his concluding that any pain or nerve injury suffered by Burks following the fusion surgery is causally connected to any defect in Danek's prod-uct. In his deposition, Dr. Aldreti offered numerous opinions about Dr. Senter's treatment of Burks. He testified that he disagreed with Dr. Senter's decision to use instrumented fusion surgery when he did, proclaiming that "they should have got more work up on" him first. · He further testified that whereas it normally takes eighteen months or longer to achieve a fusion following surgery, in Burks' case, Dr. Senter removed the hardware prematurely, i.e., just "seven months" after it was implanted,[24] and probably before a solid fusion was obtained.[25] He stated that he did not know why Dr. Senter chose to remove the hardware when he did, but speculated that there must have been a serious problem—not reflected in Dr. Senter's records—to have prompted Dr. Senter to have removed the hardware so soon after implantation.[26] On the subject of nerve damage, when asked the basis for his conclusion that Burks sustained permanent nerve injury from the implantation of metal plates and screws into his lumbar spine, Dr. Aldreti responded, "Well, he didn't have the degree of radiculopathy before the surgery that he has now in 1996, and I think that's a—a radiculopathy is essentially nerve damage." Dr. Aldreti apparently acknowledged from his review of the medical records that there was

---

22. Dr. Senter testified that upon exploring the fusion mass at the time of the explant surgery, he found that there was a solid fusion. Dr. Aldreti professes skepticism of this report, citing notations in Dr. McFadden's records following the implant surgery indicating "probable non-union," noting the fact that Dr. Senter emphasized that the posterior elements were fused but did not mention the anterior fusion, and asserting that his own review of X-rays revealed a honeycomb appearance in the fusion mass.

23. In an apparent effort to satisfy the rigors of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which plaintiffs now acknowledge they must do in light of the Fifth Circuit's ruling in *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269 (5th Cir.1998), they both characterize Dr. Aldreti's "methodology" in their respective cases as a "differential diagnosis." That, in the court's opinion, is an obvious overstatement of the "analysis" performed by Dr. Aldreti. The plain fact is, as evidenced by his own testimony, in reaching his conclusion that these plaintiffs were injured by Danek's product, Dr. Aldreti did not rule out other causes of their alleged injuries. Thus, his conclusion that their injuries were caused by Danek's product is based on pure speculation—and is not a valid differential diagnosis.

24. In fact, it was nine months later.

25. While Dr. Aldreti acknowledged that Dr. Senter's records reflect that he found a solid fusion at the time of the explant procedure, Dr. Aldreti was dubious.

26. He testified, "[W]hat I've been trying to say is that he already had this hardware removed prematurely, because there is a problem that is not in the notes that had motivated the surgeon to remove the hardware prematurely."

some evidence of radiculopathy prior to the fusion surgery, but he interpreted the medical records to reflect that this had intensified following the surgery. However, prior to rendering his opinion, Dr. Aldreti apparently had not reviewed Burks' August 1994 deposition, in which Burks testified extensively about the numbness he had in his right leg and foot and about his right leg "going out" on him, even causing him to fall, *before he had the fusion surgery.* Burks gave no indication that this condition had intensified or worsened after the surgery, and nothing to which Dr. Aldreti referred in the medical records appears to support the conclusion that it did. In any event, though, even assuming that there was increased radiculopathy after the surgery, Dr. Aldreti has given no basis for his conclusion that this condition was caused by the Danek instrumentation.[27] Accordingly, Dr. Aldreti's testimony does not satisfy Burks' burden to prove causation.

For the foregoing reasons, summary judgment is appropriate as to plaintiffs' products liability claims against Danek.

### Negligence Per Se

In her response brief, Coleman persists in arguing, as she did in response to the medical associations' summary judgment motion, that Danek violated the FDCA by promoting its product for a use for which it had not received FDA approval. However, as Judge Bechtle and this court have previously recognized, there is no private right of action for violations of the FDCA. Coleman argues further, though, that she has, and may, properly predicate a state law claim of negligence per se on Danek's alleged violation of the FDCA. The court need not resolve the theoretical viability of such a claim, however, inasmuch as plaintiffs still would have to prove causation.

See *Snapp v. Harrison*, 699 So.2d 567 (Miss.1997) (requiring proof of causation relating to negligence per se claim). Their lack of evidence that the use of Danek's product caused them injury would thus be fatal to any negligence per se claim.[28]

### Breach of Warranty

Danek has also moved for summary judgment on plaintiffs' breach of warranty claims. Because plaintiffs have not responded to the motion on this point, the court will assume the motion is confessed as to this claim.

### CONCLUSION

Based on the foregoing, it is ordered that Danek's motions to strike and for summary judgment are granted. It is further ordered that Danek's motion to dismiss Burks' complaint for fraud on the court is denied, but it is ordered that counsel for Burks shall pay to the defendant as a sanction the sum of $500.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

### FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE

The Court, having entered a Memorandum Opinion and Order on February 26, 1999, granting summary judgment in favor of Defendants Danek Medical, Inc.; Sofamor Danek Group, Inc.; Sofamor, Inc.; Sofamor, S.N.C. and Warsaw Orthopedic, Inc., and previously having dismissed other Defendants by order or stipulation, hereby enters final judgment in favor of all Defendants herein who have not previously had claims against them dismissed by final judgment, including Danek Medical, Inc.; Sofamor Danek Group, Inc.; Sofamor, Inc.; Sofamor, S.N.C. and Warsaw Ortho-

27. In this regard, the court would note that Dr. Aldreti testified that nerve damage may have been done by the surgeon when he put the instrumentation in, and he testified as well that had the hardware not been removed prematurely (for reasons admittedly unknown to him), the nerve damage may not have occurred at all. Thus, he identified other potential causes of the alleged nerve damage.

28. Though he has not responded to the motion, this holding obviously applies to Burks' putative negligence per se claim.

pedic, Inc. For the reasons stated in the Memorandum Opinion and Order entered February 26, 1999, the Plaintiffs Mary Coleman and Melvin Burks shall recover nothing, and their claims against all remaining Defendants are hereby finally dismissed with prejudice, with costs taxed against Plaintiffs Mary Coleman and Melvin Burks in favor of Danek Medical, Inc.; Sofamor Danek Group, Inc.; Sofamor, Inc.; Sofamor, S.N.C. and Warsaw Orthopedic, Inc.